*EXHIBIT B*

1/5/24, 5:45 PM
register.uwm.com/adminAgreement.aspx?applid=104392
Case 2:24-cv-10376-BRM-EAS ECF No. 22-2, PageID.318 Filed 11/25/24 Page 2 of 11

## CORRESPONDENT AGREEMENT
For Purchase and Sale of Residential Mortgage Loans

THIS CORRESPONDENT AGREEMENT ("**Agreement**"), is made and entered into as of 3/9/2020 by and between United Shore Financial Services, LLC, a Michigan limited liability company, d/b/a United Wholesale Mortgage, located at 585 South Blvd E., Pontiac, MI 48341 ("**UWM**"), and Mortgage Solutions FCS Inc., whose address is 2700 Ygnacio Valley Road Suite 255, , Walnut Creek, CA, 94598 ("**Correspondent**").

### RECITALS

WHEREAS, UWM is engaged in the business of, among other activities, purchasing mortgage loans on residential real estate and reselling such loans in the secondary mortgage market; and

WHEREAS, Correspondent is engaged in the business of originating, processing, closing, and selling residential mortgage loans; and

WHEREAS, Correspondent is a mortgagee which is approved, and during the term of this Agreement will remain approved, by the Federal Housing Administration of the Department of Housing and Urban Development ("**FHA**"), the United States Department of Veterans Affairs ("**VA**"), the United States Department of Agriculture ("**USDA**"), the Federal National Mortgage Association ("**Fannie Mae**"), the Federal Home Loan Mortgage Corporation ("**Freddie Mac**"), or any successor thereto, and/or any governmental or quasi-governmental agency or insurer which is engaged in the mortgage lending industry as applicable; and if any other approval or authority is required to be obtained to originate, process, close, fund, or service any Loan (as hereinafter defined), then Correspondent agrees to take whatever action is required to obtain such approval or authority; and

WHEREAS, UWM may from time to time buy from Correspondent, and Correspondent may from time to time sell to UWM, first and second lien position residential mortgage loans concerning one (1) to four (4) family dwellings (individually a "**Loan**" and collectively the "**Loans**") made to individual borrowers (individually, a "**Borrower**") in Correspondent's name, upon such terms and conditions as are set forth in this Agreement; and

WHEREAS, during the term of this Agreement, UWM may inform the Correspondent of UWM's various FHA, VA, USDA and conventional, jumbo and/or non-agency mortgage loan products as well as select bond programs which fall within the perimeters of loan products acceptable to UWM.

NOW, THEREFORE, in consideration of the above Recitals, the mutual covenants and promises herein contained, and other good and valuable consideration, the receipt and sufficiency of which is hereby severally acknowledged, and intending to be legally bound, the Correspondent and UWM hereby agree as follows.

### ARTICLE I
### PURCHASE OF LOANS

**1.01 Incorporation of Recitals.** The foregoing Recitals are hereby incorporated in this Agreement for the reason that same are contractual in nature.

**1.02 Purchase of Loans by UWM.** UWM agrees to consider purchasing certain Loans from the Correspondent; provided that the following requirements are met:

**(a)** All right, title, and interest in and to the Loans shall be transferred and assigned by the Correspondent to UWM free and clear of all claims, liens and encumbrances (other than title exceptions permitted by UWM in writing).

**(b)** Each Loan shall be sold and transferred to UWM on a "servicing released" basis, meaning that Correspondent shall assign, release, transfer and convey all servicing rights with respect to such Loan in a form and manner acceptable to UWM.

**(c)** All such Loans shall meet UWM's requirements, including but not limited to all verbal procedures and requirements delivered by UWM or its representatives as well as those procedures and requirements contained on UWM's website and all links incorporated therein, including but not limited to EASE, as amended from time to time (collectively, the "**UWM Guide**"), as determined by UWM in its sole and absolute discretion.

**1.03 UWM Loan Requirements.** UWM may advise the Correspondent from time to time regarding the types of Loan products ("Qualified Products") it is interested in buying, including, without limitation, information regarding interest rates, loan limits, loan-to-value ratios, loan originator compensation, and underwriting requirements. Any commitment from UWM to the Correspondent to buy any Loans will be issued in accordance with UWM's current lending policy and shall be made in UWM's sole and absolute discretion. Any such commitment must be in writing and be signed by an authorized employee of UWM and the terms of such commitment will apply only to the Loans therein specified. UWM may, in its sole and absolute discretion, cancel or discontinue any of the Qualified Products at any time, with or without notice to the Correspondent. UWM will attempt to give advance notice of such changes, but shall have no obligation to do so. The Correspondent agrees to follow the practices and procedures required by UWM, as modified from time to time, including but not limited to those contained in the UWM Guide, as well as those required under applicable law.

**1.04 Pre-Funding Review.** UWM shall underwrite, clear for close and prepare all closing documents on all Loans prior to funding and have the right to review any and all Loans prior to funding regardless of whether funded by the Correspondent or by any other source. This right may be waived by UWM in its sole and absolute discretion. Such waiver shall not be construed as relinquishment of any future right to review Loans prior to funding.

**1.05 Pricing & Rate Locks.** UWM will provide price protection for the Loans which it agrees to purchase hereunder in the form of a written lock-in confirmation pursuant to its lock-in policies and in accordance with UWM's lending requirements, including but not limited to those contained in the UWM Guide. The time at which the interest rate for a Loan is locked in shall be at Correspondent's option, provided, however, a Loan with a locked in interest rate must be presented to UWM for purchase before the expiration of the lock-in period. For purposes of this Agreement, the "**lock-in period**" shall be determined in accordance with UWM's lending requirements. If a Loan is not presented for funding by UWM within the lock-in period, such Loan may be re-priced at the sole option of UWM. The transfer or sale by Correspondent of a Loan locked in by UWM during the lock-in period to another entity, shall constitute a violation of this Agreement, and the Correspondent shall be liable for any loss sustained as a result thereof by UWM. In addition, Correspondent shall notify UWM immediately should any commitment by UWM for a locked-in Loan be canceled, withdrawn, or otherwise determined not to be set for purchase by UWM. Correspondent will deliver the underwriting package to UWM not later than ten (10) calendar days prior to the expiration of the lock-in period.

**1.06 Correspondent's Compensation.** UWM's pricing is published on a daily basis and is often adjusted several times throughout the day and reflects market conditions, the efficiency of UWM's operations and the value of the services (including Training and Information Services, as defined below) that UWM provides. All pricing is subject to change without notice and no Loan is price protected until UWM has issued a written lock confirmation. Correspondent shall not be entitled to any compensation if a Loan does not fund, regardless of the reason. In the event that any compensation negotiated by Correspondent exceeds the compensation which UWM is permitted to pay under applicable law, UWM may reduce such fees to a level which is in compliance with applicable law, without notice to Correspondent. Correspondent's fees are payable only after UWM has first deducted all of its fees and charges from the loan proceeds. Correspondent shall complete all compensation disclosure forms requested by UWM or its investor(s), as well as those required under applicable law. If the mortgagor(s) fails to make any one (1) or more of the first three (3) mortgage payments due on his/their Loan by the last day of the month in which payment is due, then Correspondent shall promptly reimburse UWM for all amounts paid by UWM to Correspondent in connection

with said Loan. **"Training and Information Services"** means the training, marketing and/or information services provided to Correspondent in furtherance of Correspondent's business, including but not limited to licensing related training and/or discounts, sample communications and/or related templates.

## ARTICLE II
## WARRANTIES & REPRESENTATIONS

**2.01 Correspondent Warranties & Representations.** The Correspondent hereby warrants, represents and covenants to UWM, with regard to each Loan submitted to UWM, that the following are true, complete and correct in all material respects as of the date of such submission as if such warranties, representations and covenants are again made by the Correspondent on those dates:

(a) **Authority.** The Correspondent is duly organized, validly existing, and in good standing in each jurisdiction in which it originates Loans delivered to UWM pursuant to this Agreement and has complied with all applicable statutes, laws, rules, regulations, orders and decrees of all federal, state, county and municipal authorities. Correspondent shall provide UWM with documentation to substantiate its continued existence, good standing and/or compliance upon the request of UWM. The Correspondent and each mortgage loan officer involved have further qualified, registered, obtained and maintains all licenses and permits and have taken all other requisite action required to originate any Loan delivered to UWM pursuant to this Agreement. The execution and delivery of this Agreement and the transactions contemplated hereby are duly authorized by and binding upon the Correspondent.

(b) **Legal Requirements.** All Loans which Correspondent submits to UWM have met all material requirements of federal, state, or local laws, as amended from time to time, including, but not limited to those contained in the UWM Guide, and (i) usury; (ii) the Federal Truth-in-Lending Act of 1969 and Federal Regulation Z thereunder; (iii) the Real Estate Settlement Procedures Act of 1974 ("**RESPA**") and Regulation X thereunder; (iv) the Federal Equal Credit Opportunity Act and Regulation B thereunder; (v) the Federal Fair Credit Reporting Act; (vi) the Flood Disaster Protection Act of 1973; (vii) the Fair Housing Act; (viii) the Home Mortgage Disclosure Act; (ix) the Financial Institutions Reform Recovery Enforcement Act of 1989 ("**FIRREA**"); (x) New York Executive Law, Article 15, Section 296-a; (xi) the Gramm-Leach-Bliley Act (Pub. L. No. 106-102, 113 Stat. 1338), as amended from time to time; (xii) the Secure and Fair Enforcement for Mortgage Licensing Act of 2008; (xiii) the Fair and Accurate Credit Transactions Act; (xiv) the Home Ownership Equity Protection Act; (xv) all rules, regulations and guidelines promulgated by the Consumer Financial Protection Bureau; (xvi) The Dodd-Frank Wall Street Reform and Consumer Protection Act; (xvii) any and all licensing requirements relating to Correspondent's and its mortgage loan officers rights to originate and sell Loans; (xviii) the requirements of all governmental authorities regulating Correspondent; and (xiv) any and all laws, rules, ordinances, and regulations concerning residential mortgage loans, adjustable rate mortgages, negative amortization, and graduated payment mortgages, and Correspondent shall maintain in its possession, and make available for UWM's inspection, and shall deliver to UWM upon demand, evidence of compliance with all such laws and requirements.

(c) **No Defects.** The Correspondent has no knowledge of any circumstances or conditions with respect to the Loans submitted to UWM that the mortgaged property, the mortgagor, or the mortgagor's credit standing would cause an institutional investor to regard the Loan as an unacceptable investment, cause the Loan to become delinquent, or materially adversely affect the value or marketability of the Loan.

(d) **Federally Insured Loans.** With regard to FHA, VA or USDA insured Loans, the Federal Housing Commissioner, the VA or the USDA, as applicable, has or will issue the Mortgage Insurance Certificate or the Loan Guaranty Certificate; and all payments due for mortgage insurance have been paid to the insuring authority; nothing has been done or omitted, and no act, omission or circumstances exist, the effect of which act, omission or circumstances would invalidate the contract of insurance with the FHA, VA or USDA as applicable; and the Loans comply with the regulations of the FHA, VA or USDA as may apply.

(e) **Appraisers & Appraisals.** All of the appraisers who have performed appraisals in connection with the Loans submitted to UWM for purchase have been properly licensed and are currently approved in accordance with applicable law- and any appraisal management company utilized has passed UWM's approval process. The appraisals submitted in connection with each Loan meet the requirements of FIRREA and any other requirements.

(f) **Compliance with Law.** All Loans originated by Correspondent have been originated and processed in accordance with all applicable laws, regulations and guidelines, including, but not limited to all applicable federal consumer financial laws.

(g) **Underwriting.** The underwriting for all Loans will be performed by UWM and all loan conditions must be approved by UWM. Upon receiving a "Clear to Close" status from UWM, the loan closing documents may be requested. UWM staff will prepare all closing documents and forward them to the title company for closing as instructed by Correspondent.

(h) **Legal Actions.** No legal actions are pending, threatened, which might adversely affect the Loan or the Correspondent's ability to transfer it or otherwise perform its obligations under this Agreement.

(i) **No Default.** The Correspondent is not in default with respect to any material agreement to which it is a party or by which it is bound, and the execution and performance of this Agreement will not violate any law, or term of the Correspondent's organizational and governance documents, as amended, or any material instrument or agreement to which the Correspondent is a party or by which it is bound, and will not violate or conflict with any other restriction of any kind or any character to which the Correspondent is subject.

(j) **Information.** All information submitted by the Correspondent to UWM with regard to the Loans, including all written materials, are true, correct, currently valid, and genuine in all material respects, as to information within the Correspondent's knowledge, and as reported by each Borrower. Correspondent has no knowledge of any circumstances or conditions with respect to any Loan submitted to UWM for underwriting, purchase and/or funding, that the mortgaged property, the mortgagor or the mortgagor's credit standing could cause an institutional investor to regard the Loan as an unacceptable investment, or otherwise cause the Loan to become delinquent or materially adversely affect the value or marketability of the Loan.

(k) **No Misstatements.** The documentation and other materials submitted to UWM in connection with the Loans do not contain any fraudulent statements or any misstatement or omission of any material fact, and the Loans have been originated in a manner consistent with prudent mortgage banking practices and consistent with the guidelines and policies established by UWM, the Consumer Financial Protection Bureau, the Government National Mortgage Association, Fannie Mae, Freddie Mac, the FHA, VA, USDA or any federal, state, or local authority established for the purpose of making residential mortgage loans to low and moderate income borrowers and issuing bonds or other obligations to fund such loans ("**Bond Authority**") as may be applicable.

(l) **Undisclosed Agreements.** There are no undisclosed agreements between any Borrower and the Correspondent or any of its employees concerning any facts or conditions, whether past, present, or future, which might in any material way affect the obligations of the Borrower to make timely payments or make any of the Loans non-saleable in the secondary market. Correspondent has no interest or direct or indirect ownership of all or any part of the property subject to a Loan and Correspondent has no ownership interest in, or familial relationship with, the seller(s), Borrower(s), broker(s), Realtor(s), inspectors, appraisers or other persons performing any settlement services relating to any Loan and shall not receive any fees or payments, either directly or indirectly, in violation of applicable law (unless such relationship has been disclosed to and approved by UWM in its sole discretion).

**(m) Material Changes.** The Correspondent shall promptly advise UWM of any material change relating to the Correspondent, including, but not limited to, any change in ownership, financial condition or senior management, including the termination of any, manager, mortgage loan officer or mortgage loan originator.

**(n) Loan Applications & Loans.** All loan applications and/or Loans presented to UWM by the Correspondent have been originated by the Correspondent, and no such Loans or applications have been originated by a third party. Correspondent did not unduly influence or otherwise steer the Borrower into selecting a higher cost loan program. Correspondent acknowledges that it does not and shall not discriminate against applicants on the basis of age, race, color, gender, ethnic background, national origin, religion, marital status, familial status, veteran status, handicap, sexual orientation, receipt of public assistance, because rights have been exercised by the applicant under any consumer protection law, or any other prohibited basis.

**(o) Notice.** With respect to this Agreement, the Correspondent will promptly notify UWM if the Correspondent becomes aware that any terms, conditions, warranties, representations or covenants hereunder have become untrue or incomplete in all material respects in the future.

**(p) Non-Employee Contractors.** The representations and warranties of the Correspondent provided for in this Agreement apply whether or not non-employee contractors are used in lieu of employees of the Correspondent in fulfilling the obligations and responsibilities of the Correspondent as provided in this Agreement.

**(q) Violations or Enforcement.** The Correspondent will immediately notify UWM if:

> (i) The Correspondent and/or any mortgage loan broker involved in originating a Loan fails to maintain a license, permit or registration in violation of this Agreement; or
>
> (ii) The Correspondent becomes subject to any enforcement and/or investigative proceeding by any licensing or regulatory authority or agency (subject to any confidentiality restrictions imposed by such licensing or regulatory authority or agency; or
>
> (iii) The Correspondent is named as a party or becomes involved in any litigation;

**(r) Financial Status.** Correspondent is solvent and has adequate capitalization and financial resources to properly engage in the business of originating and processing Loans. The Correspondent will immediately notify UWM if:

> (i) The Correspondent and/or any of its principal director(s) or owner(s) becomes a debtor in any voluntary or involuntary bankruptcy proceeding;
>
> (ii) The Correspondent and/or any of its principal director(s) or owner(s) suffers the appointment of a receiver, custodian or trustee;
>
> (iii) The Correspondent and/or any of its director(s) or owner(s) has incurred or is likely to incur a material, adverse change in its/their financial condition; and/or

(iv) The Correspondent suffers a levy, execution or seizure upon material business assets.

**(s) Survival.** All representations, warranties and covenants of Correspondent contained in this Agreement shall survive the expiration and termination of this Agreement and shall continue in effect as to each Loan for so long as any amount due from the Borrower remains outstanding and unpaid.

**(t) Correspondent Grant of Limited Power of Attorney.** The Correspondent hereby appoints UWM and the directors, officers, employees, agents, successors and assigns of UWM, as its true and lawful attorney-in-fact, which appointment shall be deemed to be coupled with an interest, without right of revocation and with full power of substitution, for and in its place and stead to:

> (i) Demand and control all sums due on Loans purchased under this Agreement and to enforce all rights with respect thereto;
>
> (ii) Endorse, mark, place or otherwise evidence the Correspondent's name as payee on all checks, drafts, acceptances or other form of partial or full payment on any Loan delivered or tendered to UWM;
>
> (iii) Endorse, mark, place or otherwise evidence the Correspondent's name on all notes, mortgages, deeds of trust, and other forms of security instruments or collateral and all assignments, full or partial releases or satisfactions of said mortgages, deeds of trust, and other forms of security instruments or collateral with respect to all Loans purchased under this Agreement. The Correspondent agrees to execute such other documents and instruments as UWM may reasonably request to evidence the appointment of UWM as the Correspondent's attorney-in-fact.

**(u) Financial Statements.** At UWM's request, the Correspondent shall provide to UWM year-end financial statements of the Correspondent, including a balance sheet and income statement. To the extent any such financial statements are audited financial statements, the Correspondent shall provide such audited financial statements to UWM. If UWM acts as FHA or VA sponsor for Correspondent, copies of all closing documents for Loans funded by UWM shall be retained by Correspondent for the time period required by FHA or VA. Correspondent is responsible for maintaining a complete origination file containing all documents that were used in processing and underwriting a Loan.

**(v) Confidential Information.** The Correspondent agrees that it will not use for its own benefit or the benefit of any other person or entity, will hold in complete confidence in compliance with applicable law, and will not disclose to any person or entity (other than Correspondent's employees or agents who need access to the Confidential Information, as defined below, for the purpose of assisting Correspondent in fulfilling its obligations hereunder): (a) the confidential information relating to UWM which it has acquired or which it may acquire during the term of this Agreement; (b) any information that it has received or which it may receive during the term of this Agreement from UWM, its employees or agents of a confidential nature; (c) all notes, documents or materials prepared by Correspondent, its employees or agents which contain, reflect or are based upon, in whole or in part, the information described in subparagraphs (a) and (b) above (collectively the "Confidential Information"). UWM makes no representations or warranties of any kind, express, implied or statutory, with respect to the Confidential Information. Correspondent will return to UWM or destroy upon demand, all Confidential Information acquired by Correspondent, its employees or agents, including all copies thereof. Correspondent will ensure that its employees and agents comply with the terms of this paragraph.

**(w) Bond.** The Correspondent has in full force and effect and will continue to maintain an errors and omissions policy or policies or mortgage banker's blanket bond covering all of its activities under this Agreement, as required by and with terms acceptable to Fannie Mae and Freddie Mac and shall provide to UWM, on an annual basis or as required by UWM, satisfactory evidence thereof, and the Correspondent also has and will continue to comply with any and all fidelity bond and surety bond requirements of Fannie Mae, Freddie Mac, and/or any state agency having or claiming to have jurisdiction over the Correspondent.

**(x) Representatives.** No employee, contractor, agent or other representative of Correspondent, or acting on behalf of Correspondent is: (a) subject to the provisions of such Executive Order 13224 or the Office of Foreign Assets Control of the United States Department of the Treasury

(the **"OFAC Regulations"**); (b) listed as a "blocked person" for purposes of the OFAC Regulations; or (c) listed on Freddie Mac's Exclusionary List, the U.S. General Services Administration (GSA) Excluded Parties List (EPL), the HUD Limited Denial of Participation List (LDP List), and/or the Federal Housing Finance Agency's (FHFA) Suspended Counterparty Program (SCP) list.

**2.02 UWM's Warranties & Representations.** UWM represents and warrants that it possesses all necessary licenses and permits from all regulatory authorities having jurisdiction over the making and processing of the Loans to engage in the activities contemplated by this Agreement.

ARTICLE III
DUTIES OF CORRESPONDENT & UWM

**3.01 Duties of Correspondent.** The Correspondent shall exercise its best efforts in connection with the performance of the following duties:

**(a)** Correspondent shall take loan applications in accordance with applicable law at its offices in its own name through its licensed employees and agents;

**(b)** Correspondent shall comply with all procedures, including but not limited to those contained in the UWM Guide, established by UWM from time to time for the submission of loan applications under the Loan programs made available to Correspondent;

**(c)** Correspondent shall confirm whether each Loan application meets the terms, conditions and requirements established by UWM with respect to the Loan programs;

**(d)** After securing the requisite authority from the applicant(s), Correspondent shall secure financial and credit information from the applicant(s) and analyze the income and indebtedness of the applicant(s) to determine the maximum reasonable Loan obligations that the applicant(s) can bear;

**(e)** Correspondent shall: (i) educate the applicant(s) in regard to the home buying and financing process; (ii) advise the applicant(s) about the different loan programs made available by UWM; (iii) explain to the applicant(s) how the closing costs and monthly payments would vary under each of the loan programs for which the applicant(s) may be eligible; and (iv) offer each applicant all loan products offered by the Correspondent which are available to such applicant in a uniform and non-discriminatory manner and Correspondent shall comply with all anti-steering laws, regulations and guidelines, and refrain from steering any applicant toward any loan product based upon the compensation that may be received by the Correspondent in connection with the sale of such loan product.

**(f)** Correspondent shall also: (i) verify the employment of the applicant(s); (ii) verify the deposits required; (iii) initiate requests for mortgage loan verifications and payoffs; (iv) order an appraisal of the property through approved appraisal management company, as required; (v) order the necessary title commitment; (vi) order a mortgage survey of the property, as required; (vii) provide the applicant(s) with all notices and disclosures required by law; and (viii) assist UWM in obtaining any additional information reasonably required by UWM in order to consider the Loan applications and/or facilitate the closing of all Loans;

**(g)** Correspondent shall communicate with the applicant(s), real estate agent(s), and UWM in an effort to keep them informed as to the status of the application and/or the Loan transaction and any changes in the terms of a Loan within a reasonable time, and if UWM and other lenders represented by Correspondent deny credit to the applicant, Correspondent will prepare and deliver to the applicant a denial notice meeting all requirements of applicable law;

**(h)** Correspondent shall assist the applicant(s) in understanding and clearing credit problems;

**(i)** Correspondent shall perform such closing services as shall be reasonably required by UWM; and

**(j)** Correspondent shall further: (i) maintain, and will ensure that its employees and agents maintain, the confidentiality all non-public personal information collected in connection with Loan applications; (ii) comply, and will ensure that its employees and agents comply, with all applicable privacy laws and other laws with respect to the completion and processing of Loan applications; (iii) maintain an information security program; and (iv) originate and process each Loan in full compliance with applicable law, the requirements of investors, and other written communications of UWM, including but not limited to those contained in the UWM Guide.

**3.02 Notification of Consumer Complaints.** Correspondent shall notify UWM via electronic mail sent to theadvocate@unitedshore.com within five (5) days of receipt of a Formal Complaint (defined below) relating to a loan application submitted to, underwritten by and/or purchased by UWM. The notification provided shall include a copy of the Formal Complaint received. "Complaint" means a consumer communication of dissatisfaction regarding a product, service and/or participant in the loan process. "Formal Complaint" means a Complaint received via: (i) any means from any state or regulatory agency, including but not limited to Attorney General offices, Congressman offices, and the Consumer Financial Protection Bureau; and (ii) electronic mail, fax, or letter that is addressed to the Chief Executive Officer, Branch Manager, President or other member of Correspondent's senior management.

**3.03 Duties of UWM.** UWM shall exercise commercially reasonable efforts in connection with the performance of the following duties:

**(a)** UWM shall underwrite or cause to be underwritten every Loan submitted by Correspondent under this Agreement, provided, however, UWM shall have no obligation to issue a commitment for or close a Loan which it determines, in its sole and absolute discretion, does not meet UWM's underwriting requirements;

**(b)** UWM shall issue a loan approval to the Correspondent if the Loan application complies with all UWM requirements, including but not limited to those contained in the UWM Guide, and UWM elects to accept the Loan application;

**(c)** UWM shall duly consider each and every Loan application submitted by Correspondent and may rely upon the materials and information supplied to it by the Correspondent as well as the authenticity and accuracy of all signatures appearing on documents and instruments delivered to UWM; and

**(d)** Upon the issuance of a commitment in UWM's name to the Correspondent, UWM shall generally proceed with closing of the Loan in accordance with the terms and conditions set forth in the commitment to the Correspondent but UWM reserves the right, in its sole and absolute discretion, to cancel the purchase and/or funding of any Mortgage Loan or Mortgage Loans for any reason which UWM determines to be material, in its sole and absolute discretion.

**(e)** UWM agrees to supply such Training and Information Services as it believes in its reasonable discretion will be productive and feasible to provide.

ARTICLE IV
POST-CLOSING OBLIGATIONS

1/5/24, 5:45 PM
Case 2:24-cv-10376-BRM-EAS   ECF No. 22-2, PageID.323   Filed 10/25/24   Page 6 of 11
register.uwm.com/adminAgreement.aspx?applid=104392

**4.01 Correspondent's Obligation Regarding Post-Closing Documents and Conditions.** The Correspondent agrees that it is responsible for assisting in obtaining and delivering all post-closing documents required to complete closed Loan packages within the time frames established by UWM. UWM, in its sole and absolute discretion, may exercise its option to NOT purchase a Loan if all underwriting and/or closing conditions or any compliance deficiencies are not satisfied for any other reason. The Correspondent understands that it is not authorized or empowered to accept or clear any lending conditions of UWM. The Correspondent further understands and agrees that if the Correspondent fails, neglects, or refuses to obtain and deliver any post-closing documents reasonably required by UWM, then UWM shall have the unilateral right to offset the reasonable costs associated with securing such post-closing documents against any amounts payable by UWM to the Correspondent. Correspondent shall upon request from UWM, exercise its best efforts to take all actions necessary, in a timely and accurate manner, to obtain corrections to any and all loan documents deemed appropriate or desirable in UWM's sole and absolute discretion and to otherwise assist UWM in remedying any matter not in compliance with applicable law, regulations, or the requirements of UWM, including assisting UWM in obtaining recorded documentation related to a Loan and title policies from closing agents, or to enable UWM to sell, convey, obtain guaranty for, or market a Loan. The failure, refusal and/or neglect of Correspondent to secure post-closing documentation in a timely manner shall entitle UWM to exercise a right of set off with respect to any amounts due Correspondent, and/or the right to require the repurchase of the loan in question by the Correspondent, in the sole and absolute discretion of UWM.

ARTICLE V
INDEMNIFICATION & REPURCHASE BY CORRESPONDENT

**5.01 Indemnification by Correspondent – Generally**.

**(a) Indemnity Generally & Legal Counsel.** The Correspondent agrees to indemnify, defend and hold UWM harmless from and against any and all liabilities, claims, losses, or damages whatsoever, including all associated costs and attorney's fees (individually a "Claim" and collectively the "Claims"): (i) resulting from any breach of the terms or conditions of this Agreement; (ii) resulting from any act or omission by the Correspondent in connection with any Loan subject to this Agreement; (iii) arising from or in connection with the Correspondent's use of any non-industry standard form not provided or approved by UWM in connection with any Loan; (iv) concerning miscalculations and other errors which result from the Correspondent's independent application and processing procedures or from its misuse of forms required by UWM; (v) asserted against UWM under provisions of RESPA, including, without limitation, claims based upon or arising as a result of any improper or prohibited compensation received by the Correspondent; (vi) incurred or paid by UWM as a result of the exercise of a right of cancellation or right of recession by any Borrower in connection with a Loan; and (vii) extraordinary servicing costs or carrying costs related to any Loan as a result of any of the following circumstances: (i) any breach of any representation, warranty or covenant contained herein, or any material breach of this Agreement; or (ii) if UWM is required to repurchase any Loan which it has sold to an investor, or which it has placed or pledged to a mortgage pool, which repurchase requirement is a result of the Loan being classified as a Defective Loan, as defined below, as the result of any act or omission of the Correspondent, the Correspondent shall be obligated to promptly repurchase such Loan. A *"Defective Loan"* means any Loan that has a breach in any respect of any representation or warranty herein contained with respect to such Loan or any failure by the Correspondent to comply with any covenant or condition herein contained with respect to such Loan which could reasonably be expected to result in a loss or damage to UWM or a subsequent purchaser of such Loan.

**(b)** If any Claim shall be asserted or brought against UWM by reason of any of the foregoing, then the Correspondent shall, upon demand, obtain representation by legal counsel acceptable to UWM to defend UWM against any such Claim and the Correspondent shall pay all actual costs and actual attorneys' fees incurred in such defense. All of the provisions in this Article V shall survive the closing of each Loan transaction, and shall inure to the benefit of UWM and future assignees of UWM.

**5.02 Terms of Indemnification.**

**(a) Advances.** The Correspondent may be required (at UWM's option, exercised in its sole and absolute discretion) to remit to UWM immediately upon demand a good faith advance to be applied by UWM to cover any such loss; and

**(b) Administration Fee.** The Correspondent may be required (at UWM's option, exercised in its sole and absolute discretion) to remit to UWM immediately upon demand a nonrefundable Loan administration fee in addition to the administration fee provided for in Section 5.01(a) of this Agreement; and

**(c) Compensation Reimbursement.** The Correspondent shall, immediately upon receipt of notice from UWM, fully reimburse UWM for all compensation paid to Correspondent by UWM, whether such compensation was included in the gross price paid or referenced separately; and

**(d) Other Actual Losses.** The Correspondent may be required to remit to UWM immediately upon demand any additional amount to cover any actual loss to UWM not otherwise reimbursed by the good faith advance or the Loan administration fees as above provided. Any good faith advance and additional amounts required under this Article V in excess of actual losses will be returned to the Correspondent upon final loss reconciliation by UWM. The Correspondent agrees that its failure to comply with the terms of the indemnification provisions within this Agreement shall give UWM the right to seek full repurchase of the Loan.

**5.03 Right of Set-Off.** The Correspondent grants UWM the right of set-off, and UWM may deduct any fees, penalties, or other sums, including, without limitation, actual attorneys' fees, owed by the Correspondent to UWM under this Agreement from the purchase price of any Loans purchased by UWM from Correspondent. The Correspondent shall be responsible for compensating UWM for any tolerance cure(s) that UWM is required to make to the Borrower because of the Correspondent's acts or omissions in connection with the Loan as determined by UWM in its sole and absolute discretion. UWM may also withhold, set-off, and apply any compensation, expenses, tolerance cures or other matters otherwise due and payable to Correspondent to any obligations of the Correspondent to UWM. In no event shall any compensation be paid to the Correspondent unless a Loan is funded. UWM shall have the right to withhold any compensation or payments until the Loan file is complete, and the Correspondent has performed all of its obligations under this Agreement.

ARTICLE VI
CORRESPONDENT USER OF
DESKTOP UNDERWRITER

**6.01 ARTICLE VI Definitions.** Any capitalized terms used in Article VI and not otherwise defined in ARTICLE VI or this Agreement have the meanings given to them in the License Agreement (as hereinafter defined). UWM has entered into the Fannie Mae Licensed Application Master Terms and Conditions ("**Master Terms**") and its Desktop Underwriter® Schedule and associated Redistribution Addendum thereto ("**DU Schedule**" and "**Addendum**", respectively, and, together with the Master Terms, the "**License Agreement**") with Fannie Mae governing the rights and obligations of UWM and Fannie Mae with respect to UWM's use of Desktop Underwriter (the "**Licensed Application**"). Correspondent is an Affiliate or Subsidiary of UWM and desires to use the Licensed Application in connection with Prequalification Analysis, mortgage loan origination and/or underwriting activities.

All words and phrases defined in this ARTICLE VI shall, for the purposes of this ARTICLE VI **only**, have the following respective meanings:

(a) **"Affiliate"** shall mean a mortgage lending entity or Third Party Originator that performs Prequalification Analyses, origination or underwriting in relation to mortgage loans assigned or sold to UWM.

(b) **"Consumer Credit Data"** shall mean any information obtained by the Correspondent, either directly or indirectly, which bears on a

consumer's creditworthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living (the "**Seven Factors**") and which is used or expected to be used or collected in whole or in part for the purpose of serving as a factor in underwriting a Mortgage Loan Application or performing a Prequalification Analysis. Such data may include, but are not limited to, data contained in: (i) residential mortgage credit reports, "in-file" credit reports, or "consumer reports," as defined in the FCRA; (ii) the Uniform Residential Loan Application, including any attachments and/or supplements thereto; and (iii) any correspondence or communication from the consumer or any third party which includes information relating to one of the Seven Factors.

(c) **"Mortgage Loan Application"** shall mean the submission by a mortgage loan applicant of financial information and identification of the specific property to secure the mortgage loan for the purpose of obtaining an underwriting decision.

(d) **"Prequalification Analysis"** shall mean the evaluation of Consumer Credit Data with respect to a prospective mortgage loan applicant for the purpose of evaluating such prospective applicant's qualification for mortgage financing, other than in connection with a Mortgage Loan Application.

(e) **"Subsidiary"** shall mean a mortgage lending entity more than fifty percent (50%) of whose controlling interest or outstanding voting shares or securities are owned or controlled, directly or indirectly, by UWM.

**6.02 License Agreement.** Correspondent represents that it is an Affiliate or Subsidiary of UWM and that it has received and read the License Agreement and understands and agrees that it shall be fully obligated to comply with each and every provision of such License Agreement in connection with its use of the Licensed Application.

**6.03 Licensing Rights.** UWM agrees that, as and to the extent set forth in ARTICLE VI, its license rights under the License Agreement shall extend to Correspondent in connection with the Licensed Application. Correspondent agrees that the rights granted to it shall not extend to any third party, including, but not limited to, Correspondent's customers, subsidiaries and/or affiliates.

**6.04 UWM Agent.** Correspondent expressly appoints UWM as its agent, as that term is defined in the FCRA, in connection with any use of the Licensed Application by Correspondent with respect to Mortgage Loan Applications or Prequalification Analyses. Correspondent also expressly acknowledges, understands and agrees that UWM's role as Correspondent's agent shall not extend beyond the limited purposes set forth in this Section 6.04, and for all other purposes, there shall be no such principal and agent relationship. Moreover, Correspondent shall in no way misrepresent to third parties the limited extent of this principal/agent relationship. Correspondent further acknowledges, understands and agrees that any recommendation rendered by the Licensed Application in the evaluation of Consumer Credit Data will not constitute an approval or denial of the Mortgage Loan Application by UWM or a commitment to purchase by UWM.

**6.05 Fannie Mae Agent.** In connection with the processing and evaluation of Consumer Credit Data by the Licensed Application for purposes of making an underwriting recommendation or performing a Prequalification Analysis (if applicable), Correspondent expressly appoints Fannie Mae, as owner of the Licensed Application, as its agent, as that term is defined in the FCRA. As Correspondent's agent, Fannie Mae shall, and is hereby expressly authorized by Correspondent to, obtain Consumer Credit Data for the sole purpose of performing a Prequalification Analysis and/or making an underwriting recommendation. Correspondent also expressly acknowledges, understands and agrees that Fannie Mae's role as Correspondent's agent shall not extend beyond the limited purposes set forth in this Section 6.05, and for all other purposes, there shall be no such principal and agent relationship. Moreover, Correspondent shall in no way misrepresent to third parties the limited extent of this principal/agent relationship. Correspondent further acknowledges, understands and agrees that any recommendation rendered by the Licensed Application in the evaluation of Consumer Credit Data will not constitute an approval or denial of the Mortgage Loan Application by Fannie Mae or a commitment to purchase the loan by Fannie Mae. Correspondent shall disclose any secondary use of Consumer Credit Data that is facilitated by use of the Licensed Application to the issuing consumer reporting agency.

**6.06 Affiliate Relationship.** If Correspondent is an Affiliate, Correspondent shall use the Licensed Application for the primary purpose of (i) originating or underwriting mortgage loans intended to be assigned or sold to UWM, and/or (ii) performing Prequalification Analyses for UWM (to the extent that the performance of Prequalification Analyses utilizing the Licensed Application is permitted under the License Agreement). If Correspondent is an Affiliate, Correspondent shall not be permitted to use the Licensed Application's wholesale lending ("DU® wholesale") functionality pursuant to this Correspondent Agreement. If Correspondent is a Subsidiary, Correspondent shall use the Licensed Application only in connection with its own Mortgage Loan Applications and/or Prequalification Analyses and/or those of UWM (to the extent that the performance of Prequalification Analyses utilizing the Licensed Application is permitted under the License Agreement).

**6.07 Requesting Additional Consumer Reports.** Notwithstanding anything to the contrary in that Section of the DU Schedule captioned "Use of Licensed Application," Correspondent must first obtain written permission from the mortgage loan applicant to request additional consumer reports before using the Licensed Application as described below:

    (a) With respect to Mortgage Loan Applications previously approved but not yet closed:

        (i) to request and receive additional Consumer Reports through the Credit Retrieval Module, when Correspondent is requesting such reports in connection with its own Mortgage Loan Applications and/or Prequalification Analyses, or because other circumstances exist which Correspondent believes justify the request for such additional consumer reports under the FCRA;

        (ii) to analyze or evaluate Consumer Credit Data, including Consumer Reports, when Correspondent determines that data obtained subsequent to its initial approval may affect its prior underwriting approval decision;

        (iii) to request and receive Consumer Reports and/or analyze or evaluate Consumer Credit Data when the loan applicant(s) request different loan terms or a different loan product than that originally requested by the loan applicant(s); and

    (b) With respect to Mortgage Loan Applications previously denied by Correspondent, which denial decision has been communicated to the applicant(s):

        (i) to request and receive Consumer Reports through the Credit Retrieval Module, when Correspondent is requesting such reports in connection with its own Mortgage Loan Applications and/or Prequalification Analyses;

        (ii) to analyze or evaluate Consumer Credit Data, including Consumer Reports, when (A) Correspondent determines that data obtained subsequent to its initial denial decision may affect its prior underwriting decision, and (B) Correspondent intends to make and communicate an offer of credit to the applicant(s) if an approval recommendation decision is rendered by the Licensed Application as a result of consideration of the additional data obtained.

**6.08 Intended Beneficiary.** The parties acknowledge and agree that Fannie Mae is an intended beneficiary of ARTICLE VI.

**6.09 Termination of ARTICLE VI.** ARTICLE VI shall remain in full force and effect unless terminated pursuant to the provisions of this Section or terminated pursuant to Section 7.05. The parties acknowledge and agree that ARTICLE VI is subject to the License Agreement and that ARTICLE VI shall automatically

terminate upon termination of the Desktop Underwriter Schedule and/or the Redistribution Addendum by Fannie Mae and/or UWM. The parties acknowledge that, pursuant to the terms of that Section of the Redistribution Addendum captioned "Termination of Affiliates and Subsidiaries", Fannie Mae may, in its absolute discretion, immediately terminate access by Correspondent to the Licensed Application for any breach of (a) the License Agreement, (b) ARTICLE VI of the Agreement, or (c) any other agreement between Correspondent and any lender (including UWM) that has access to the Licensed Application. Upon a termination of ARTICLE VI, the other terms and conditions of this Agreement shall continue in full force and effect unless otherwise terminated or amended pursuant to the terms hereof.

**6.10 Licensed materials.** Immediately upon termination of either ARTICLE VI or this Agreement, Correspondent shall cease using the Licensed Materials, and destroy or return all copies of the Licensed Materials in its possession to UWM. Promptly upon request from UWM or Fannie Mae, Correspondent shall provide UWM or Fannie Mae with written certification of its compliance with the foregoing, executed by a duly authorized officer of Correspondent.

**6.11 DU Support.** UWM, and not Fannie Mae, shall be responsible for providing Correspondent with (i) first line support with respect to Correspondent questions and comments concerning Fannie Mae's automated underwriting guidelines and policies, including, but not limited to, questions concerning the interpretation and applicability of the Licensed Application's findings reports and questions relating to Fannie Mae's Selling Guide and (ii) appropriate training relating to the use of the Licensed Application and such guidelines and policies.

**6.12 ARTICLE VI Conflict with License Agreement.** In the event of a conflict between the terms of ARTICLE VI and the terms of the License Agreement, the terms of the License Agreement shall govern.

**6.13 Assignment of ARTICLE VI Rights.** Rights under ARTICLE VI may not be assigned by Correspondent to any other person(s), firm(s), corporation(s) or other entities without the prior express written consent of Fannie Mae and UWM.

**6.14 Notification.** This Section 6.14 applies only to notices required by ARTICLE VI. All other notices required pursuant to this Agreement shall be provided according to Section 7.19 of this Agreement. All notices, requests, demands, and other communications (other than routine operational communications) required or permitted hereunder shall be in writing and shall be deemed to have been received by a party (i) when actually received in the case of hand delivery, (ii) one (1) business day after being given to a reputable overnight courier with a reliable system for tracking delivery, (iii) when sent by confirmed facsimile with a copy sent by another means specified in this paragraph, or (iv) seven (7) days after the date of mailing, when mailed by United States mail, registered or certified mail, return receipt requested, postage prepaid, and addressed to the recipient's contact person/address set forth below:

UWM:

United Shore Financial Services, LLC,
d/b/a United Wholesale Mortgage
585 South Blvd E.
Pontiac, MI 48341
Attention: CLIENT APPROVAL TEAM

Correspondent:

Mortgage Solutions FCS Inc.
2700 Ygnacio Valley Road Suite 255

Walnut Creek, CA 94598

In the event that the recipient does not so specify a contact person/address, notices shall be addressed to the general counsel at the recipient's corporate headquarters. A party may from time to time change its address or designee for notification purposes by giving the other party prior written notice of the new address or contact person.

**6.15. Conflict.** In the event that any provision of ARTICLE VI conflicts with the law under which ARTICLE VI is to be construed, or if any such provision is held invalid, void or unenforceable by a court with jurisdiction over the parties to ARTICLE VI, such provision shall be deemed to be restated to reflect as nearly as possible the original intention of the parties in accordance with applicable law, and the remainder of ARTICLE VI and the Agreement shall remain in full force and effect.

## ARTICLE VII
## MISCELLANEOUS PROVISIONS

**7.01 Amendment of Agreement.** Except as provided in Section 7.07, this Agreement may not be amended except in a writing executed by authorized representatives of both Correspondent and UWM.

**7.02 Waiver Non-Binding.** The failure of UWM to insist in any one or more instances upon strict performance of any of the covenants, agreements, or conditions of this Agreement or to the exercise of any rights hereunder shall not be construed as a waiver or a relinquishment for the future of such covenants, agreements, conditions, or rights, and any and all waivers must be in writing and be signed by the party waiving its rights.

**7.03 No Obligations to Make Loans.** Nothing contained in this Agreement shall be construed to require UWM to approve and/or purchase any Loan or Loans submitted by the Correspondent pursuant to the terms of this Agreement. Approval and/or purchase of all Loans shall be in the sole and absolute discretion of UWM, and such decision will be made on a loan by loan basis.

**7.04 No Agency or Employment Relationship.** With the limited exception in Section 6.04 of this Agreement, both parties understand and agree that it is not intended that this Agreement create or establish a relationship of employer and employee between UWM and the Correspondent, nor is it intended that Correspondent will be UWM's partner, joint venturer or agent. The Correspondent is an independent contractor, and is hereby expressly prohibited from holding itself out as an agent, representative, or employee of UWM, or having any endorsement from or affiliation with UWM. The Correspondent has no authority and is intended to have no power to create, extinguish or modify any right, obligation or liability of UWM to any person whatsoever. The Correspondent shall hold funds collected on account of any Loan in trust for UWM. It is expressly understood that, notwithstanding the execution of this Agreement, UWM may make Loans with or without the assistance of Correspondent and may use the services of such other correspondents and lenders as UWM desires.

**7.05 Termination.** This Agreement may be terminated by either party for any reason, with or without cause, breach or other justification, upon seven (7) days prior written notice, and may be terminated immediately: (a) for breach of any covenant, obligation, or duty herein contained; or (b) for violation of any law, ordinance, statute rule or regulation governing the conduct of either party hereto; or (c) upon the suspension, cancellation, or termination of any license or permit required by a party to conduct business and/or perform its obligations hereunder; or (d) if any warranty, representation or statement made by a party to this Agreement was false in any material respect when made or furnished; or (e) in the event a party becomes a debtor in any voluntary or involuntary bankruptcy proceeding; or (f) in the event that a party shall become insolvent, fails to pay its debts as they become due, or makes an assignment

1/5/24, 5:45 PM
register.uwm.com/adminAgreement.aspx?applid=104392
Case 2:24-cv-10376-BRM-EAS  ECF No. 22-2, PageID.325  Filed 04/05/24  Page 9 of 11

for the benefit of its creditors; or (g) in the event of a seizure, execution or levy upon material assets of a party; or (h) in the event of a dissolution of a party; or (i) upon the sale or disposition of a significant portion of the assets or equity interests of a party; or (j) in the event that a trustee, custodian or receiver shall be appointed in connection with material assets of a party. Termination shall not affect the obligations with respect to any Loans submitted prior to such termination, except that UWM shall not be obligated to purchase and/or fund any such Loans approved prior to termination if UWM terminates this Agreement for breach by Correspondent on the basis of fraud, dishonesty, misrepresentation, negligence or other breach of this agreement. In addition, termination shall not affect either party's obligations with respect to amounts previously owed to the other party pursuant to this Agreement, or Correspondent's indemnification and confidentiality obligations to UWM.

**7.06 Term.** This Agreement is for an initial term of one (1) year and shall automatically renew for successive terms of one (1) year each unless sooner terminated pursuant to the preceding Section 7.05 of this Agreement.

**7.07 UWM Amendments & Website.** This Agreement and the policies, procedures and instructions of UWM, including but not limited to those contained in the UWM Guide, may be amended by UWM from time to time upon written notice to the Correspondent of the amendment, which may occur by posting any such amendments on UWM's website, which Correspondent is required to regularly check and monitor as a condition of this Agreement. The Correspondent agrees that submissions to UWM after such notification shall be the Correspondent's agreement to the amendment without further signature or consent of any kind. Any such amendment shall apply to pending and/or future submissions by the Correspondent.

**7.08 Quality Control.** The Correspondent agrees to provide UWM upon its request copies of the Correspondent's policies and procedures, training materials and other applicable documentation related to the Correspondent's business practices for review by UWM. The Correspondent shall also permit any officer, employee or designated representative of UWM, at any reasonable time during regular business hours, to examine, reproduce and make audits of any of the processes implemented by and documents kept by the Correspondent regarding Correspondent's compliance with applicable law as well as any Loan submitted to UWM pursuant to this Agreement. If the Correspondent fails to timely deliver all documents and records associated with or related to any Loan submitted to UWM pursuant to this Agreement, then the Correspondent shall also give UWM and its officers, employees, and/or designated representatives reasonable access to the Correspondent's premises to allow UWM to retrieve, reproduce, prepare or otherwise obtain all such documents and records. The Correspondent shall also make its officers, employees, and/or designated representatives available to UWM and shall cooperate with UWM in all such examinations, audits, and document and record collection activities. Further, Correspondent hereby consents and gives UWM permission to record telephone calls between employees and independent contractors of UWM and Correspondent for quality control purposes and further, Correspondent represents and warrants that it has obtained or will obtain all required consents and approvals of Correspondent's current and future employees and independent contractors authorizing UWM to record such phone calls.

**7.09 Unacceptable Submissions.** Under no circumstances shall the Correspondent submit (a) any Loans that would be considered to constitute a "high cost loan" or "predatory loan" as defined in; (i) the Home Ownership and Equity Protection Act, as amended; or (ii) any other federal, state, or local laws, regulations or guidelines.

**7.10 Correspondent Advertising and Customer Privacy.** The Correspondent may advertise to the public the availability of various loan programs and Correspondent's services. The Correspondent may not, in any way, directly or indirectly, identify UWM or its related parties in any such advertising unless: (i) required by applicable laws or regulations; or (ii) UWM has, in advance, approved the use of UWM's name by the Correspondent in writing. Correspondent agrees to provide UWM upon its request with model advertising samples in use at the time of application to do business with UWM, as well as to notify UWM with questions on any substantive changes to those advertisements, or of any new advertisements Correspondent uses. Without the prior consent of UWM, the Correspondent shall not sell or distribute any customer list incorporating the names, addresses or any non-public personal information of such Borrower(s).

**7.11 Entire Agreement.** The arrangements and relationships contemplated in this Agreement and/or any document referred to herein constitute the sole understandings and agreements of the parties. This Agreement supersedes all other agreements, covenants, representations, warranties, understandings, and communications between the parties, whether written or oral, with respect to the transactions contemplated by this Agreement.

**7.12 Invalidity & Severability.** The invalidity or unenforceability of any particular provision of this Agreement shall not affect the other provisions of this Agreement, and any provision determined to be invalid and/or unenforceable by a court or tribunal of competent jurisdiction shall be revised and reformed to make such provision valid and/or enforceable, if possible, to the fullest extent permitted by law, otherwise this Agreement shall be construed as if such invalid or unenforceable provision was omitted.

**7.13 Benefit & Assignment.** Correspondent may not assign its rights and/or delegate its duties and obligations under this Agreement without the written consent of UWM. UWM may assign its rights and/or delegate its duties and obligations under this Agreement to any subsidiary, affiliate or successor in interest without the consent of Correspondent. Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the parties and their respective heirs, legal representatives, successors and assigns.

**7.14 Governing Law; Waiver of Jury Trial.** This Agreement shall be governed by, and construed and enforced in accordance with applicable federal laws and the laws of the State of Michigan, without reference to conflict of laws principles. The parties to this Agreement hereby unconditionally and irrevocably: (a) submit to the exclusive jurisdiction of the Oakland County (Michigan) Circuit Court, or in the event that original jurisdiction may be established, the United States District Court for the Eastern District of Michigan, Southern Division, sitting in Detroit, Michigan (hereinafter the "Courts"), in any action arising out of this Agreement; (b) agree that all Claims in any action must be decided in one of said Courts; and (c) waive, to the fullest extent that they may effectively do so, the defenses of: (i) lack of subject matter jurisdiction of such Courts; (ii) the absence of personal jurisdiction by such Courts over the parties to this Agreement; and (iii) forum non-conveniens.

**7.15 Attorneys' Fees.** If a dispute arises under this Agreement between the Correspondent and UWM which results in legal action being taken by one or both of the parties, then the prevailing party shall be entitled to recover as its reasonable attorneys' fees, costs, and other expenses associated with the enforcement of its rights under this Agreement, and the non-prevailing party hereby agrees to promptly pay same.

**7.16 Early Payoffs.** UWM is committed to the long term performance of its loans. As such, if any Loan delivered hereunder is paid off within one hundred eighty (180) days of the funding of such Loan for any reason, then Correspondent shall reimburse UWM for all amounts paid by UWM to the Correspondent in connection with said Loan, or pay UWM one (1%) percent of the amount of the Loan, whichever is greater.

**7.17 Enforceability & Construction.** Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall as to such jurisdiction be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining portions hereof or affecting the validity or enforceability of such provision in any other jurisdiction, and to this end, the provisions hereof are severable. In the event of any conflict, inconsistency or ambiguity between the terms of this Agreement and those contained in any Amendment hereof or Addendum hereto, the terms and conditions of such Amendment and/or Addendum shall be deemed to govern and control. Notwithstanding the foregoing, in the event of any conflict, ambiguity or inconsistency between the terms and conditions contained in this Agreement and those set forth in the UWM Guide, the terms and conditions of the UWM Guide shall be deemed to supersede and control.

**7.18 Counterparts & Electronic Signatures.** This Agreement may be executed in one or more counterparts, each of which shall constitute an original and all of which shall constitute the same Agreement. The parties to this Agreement hereby further agree that due to their distant locations and/or differing schedules, this Agreement may be executed via facsimile, electronic mail or electronic signature and that a facsimile or electronic signature of this Agreement containing counterpart facsimile, electronic or other signatures shall be valid and binding for all purposes.

**7.19 Notices.** Any notices under this Agreement will be sufficient if in writing and delivered personally, by U.S. certified mail, return receipt requested, or by a nationally recognized express courier service, to the addressees set forth below, or to such other addresses as may hereafter be furnished by either party to the other party by like notice or via electronic mail, if consented to by the parties:

    If to UWM, then to:

        United Shore Financial Services, LLC,
        d/b/a United Wholesale Mortgage
        585 South Blvd E.
        Pontiac, MI 48341
        Attention: CLIENT APPROVAL TEAM

    If to Correspondent:

        Mortgage Solutions FCS Inc.
        2700 Ygnacio Valley Road Suite 255

        Walnut Creek, CA 94598

**7.20 No Third Party Beneficiaries.** Except for Section 6.08 and Section 7.26 of this Agreement the parties to this Agreement do not intend to confer benefits upon any person or entity who or which is not a signatory to this Agreement.

**7.21 Time Is Of The Essence.** Time shall be of the essence for purposes of this Agreement as well as with respect to all of the documents and instruments executed in connection herewith.

**7.22 Interpretation.** This Agreement (and all agreements, documents, instruments and/or exhibits referred to or incorporated into this Agreement) is being entered into among competent persons, who are experienced in business and represented by counsel, and has been reviewed by the parties and their counsel. Therefore, any conflicting or ambiguous language contained in this Agreement (and all agreements, documents, instruments and/or exhibits referred to or incorporated herein) shall not necessarily be construed against any particular party as the drafter of such language.

**7.23 WAIVER OF JURY TRIAL.** CORRESPONDENT AND UWM ACKNOWLEDGE THAT THE RIGHT TO TRIAL BY JURY IS A CONSTITUTIONAL ONE, BUT THAT IT MAY BE WAIVED. UWM AND CORRESPONDENT, AFTER CONSULTING COUNSEL OF THEIR CHOICE, EACH HEREBY KNOWINGLY AND VOLUNTARILY, WITHOUT COERCION, WAIVE ALL RIGHTS TO A TRIAL BY JURY OF ALL DISPUTES BETWEEN THEM.

**7.24 Authorization.** Correspondent hereby consents and gives UWM permission to obtain information about the Correspondent. Correspondent agrees to provide written confirmation to UWM that is has conducted background checks on any and all employees and independent contractors of the Correspondent that include, without limitation, professional history information, criminal record information, credit information and other public information. Further, at UWM's request, Correspondent agrees to provide UWM with the adjudication criteria associated with such background checks as well as the results indicating conformance to such criteria. At UWM's request, Correspondent also agrees to confirm in writing that the background checks of its employees and independent contractors produced no violation(s) of applicable agency guidelines as well as all federal, state and/or local laws by said employees and independent contractors. Correspondent consents to the release of information to regulators and law enforcement agencies about any Mortgage Loan or loan application that may be suspected to contain misrepresentations and/or irregularities. It is understood and agreed that Correspondent and its employees may be named as the originator or loan officers on such Mortgage Loans, whether or not Correspondent or its employees are implicated in any allegations of wrongdoing. Correspondent hereby releases and agrees to indemnify, defend and hold harmless UWM from and against any and all liability for damages, losses, costs and expenses that may arise from the reporting or use of any information submitted by UWM or used in any way by UWM.

**7.25 Authorization Release.** Correspondent hereby consents to a review and confirmation of any and all documents, records and other information related to its officers, directors, principals, and similarly situated persons with strategic decision making authority in Correspondent and Correspondent as to their and its business professional and financial reputation and standing, personal financial standing, fitness as a mortgage correspondent, a concurrent funding correspondent and/or wholesale correspondent, and such other information as may be received during the review and confirmation to be provided to UWM. Every firm, company, governmental agency, court, association or institution having control of any documents, records and other information pertaining to Correspondent or any of its officers, directors, principals, and similarly situated persons with strategic decision making authority in Correspondent is hereby authorized and requested to furnish, allow to be copied or otherwise provide, information of the kind described above to UWM or its representatives, conducting the review and confirmation. This authorization and request includes, but is not limited to, documents, records or files regarding any charges or complaints filed against any of the aforementioned individuals, including any complaints erased by law, whether formal or informal, pending or closed, and information from Interthinx, Inc. database. Correspondent specifically authorizes and requests consumer credit reporting agencies to provide personal credit history on any owner of Correspondent, executive officer of Correspondent or similarly situated person with strategic decision making authority in Correspondent to UWM. In consideration of the time and expense incurred in reviewing and evaluating the application and qualifications of Correspondent and its officers, directors, principals and similarly situated persons with strategic decision making authority in Correspondent as to its and their fitness as a Correspondent for UWM, and to facilitate the providing of information for the review and confirmation by UWM, on behalf of the aforementioned persons and Correspondent, on behalf of itself and its officers, directors, principals and similarly situated persons with strategic decision making authority in Correspondent, hereby releases, discharges, exonerates and covenants not to sue any person, company or governmental organization providing information in the review and confirmation, any recipient of information, including UWM, its representative, its parent, sister and affiliate companies and its and their officers, agents, employees and independent contractors, from any and all liability of every nature and kind arising from or in connection with the furnishing of information, the inspection of documents, records and other information, and the preparation of the review and confirmation of the information provided to UWM.

**7.26 Loan Prospector/Intended Beneficiary.** Freddie Mac offers its automated underwriting service, Loan Prospector, to organizations which are licensed originators of mortgage loans but do not have a seller agreement or seller number with Freddie Mac ("Third Party Originators"). For Third-Party Originators to access Loan Prospector, the Third-Party Originators must obtain a Third-Party Originator Number from Freddie Mac. Correspondent represents and warrants to UWM that it shall comply with any rules, guidelines or other requirements established by Freddie Mac in connection with Correspondent's use of Loan Prospector. Correspondent and UWM acknowledge and agree that Freddie Mac is an express, intended third-party beneficiary of this Agreement solely for the purpose of enforcing Freddie Mac's rights under this Agreement, including but not limited to under this Section 7.26.

**7.27 MERS Requirements.** For those Mortgage Loans that UWM is considering purchasing from Correspondent, Correspondent agrees to close all such Mortgage Loans using Correspondent's MIN and further agrees that Correspondent shall not close any such Mortgage Loans using UWM's MIN. Further, for those Mortgage Loans that UWM is considering purchasing from Correspondent, Correspondent agrees to register all such Mortgage Loans with MERS within seven (7) days of the date of the respective Mortgage Note.

**7.28 Marks.** While Correspondent is registered to do business with UWM, UWM grants to Correspondent a non-exclusive, revocable, non-sublicensable, non-transferable license to use the mark, name or logo of its Blink application system (**"Blink Mark"**) in association or in connection with the operation of Correspondent's services or business within the United States. It is understood and agreed that this license shall pertain only to the Blink Mark. Correspondent acknowledges that Correspondent shall not acquire any right, title or interest in the Blink Mark by virtue of this license. Correspondent shall not by any act or omission use the Blink Mark in any manner that disparages or reflects adversely on UWM or its business reputation and shall indemnify,

defend and hold harmless UWM in connection with any act or omission of Correspondent, its employees or agents associated with the license granted hereunder. UWM may terminate this license at any time and for any reason. Upon either the termination of the license or if Correspondent is no longer registered to do business with UWM, the Correspondent shall immediately discontinue all use of the Blink Mark. Further, Correspondent shall not use any other mark, name or logo of UWM or any related entity of UWM without UWM's prior written approval.

**7.29 UWM Programs.** From time to time, certain programs may be offered by UWM, or on behalf of UWM, to Correspondent, or through Correspondent to the Borrowers, in connection with the Mortgage Loans or Correspondent's business relationship with UWM (collectively, the ***"UWM Programs"***). Correspondent waives, releases and forever discharges UWM from and against any and all responsibility, liability, demands, damages, claims and actions of every name and nature that may arise from the UWM Programs.

The parties have executed this Agreement as of the date and year first above written.

Electronically signed **3/9/2020 1:54:50 PM** by **Ramon Walker** of **Mount Diablo Lending** from **10.10.5.240**.

United Wholesale Mortgage, LLC Accepted **4/17/2020 2:23:59 PM** by **Iterrasi** from **10.10.5.240**.